OPINION
On February 8, 1999, Scott Pickerel filed a complaint in the Franklin County Court of Common Pleas against Huntington National Bank, AKA, Huntington Trust Company, N.A. ("Huntington") and "Kathy A. Hanley."[1]
The complaint set forth several claims against Huntington for its alleged breach of various duties in the administration of the Ray E. Graham Trust. Ray E. Graham, Mr. Pickerel's grandfather, created a trust in 1972, and a trust agreement was executed wherein Huntington was named trustee. Mr. Pickerel is the sole remaining beneficiary under the trust.
As of December 31, 1981, approximately eleven percent of the trust's assets were invested in The Limited, Inc. common stock ("Limited stock"), and the value of the trust at such time was $504,448.77. Originally, the trust held 4,000 shares of Limited stock. From November 1982 through July 1997, the Limited stock outperformed stocks in general by an exceptional margin. As a result, from November 1982 to June 1990, the Limited stock split five times. The first two splits, which occurred by June 1983, caused the percentage of Limited stock in the trust to grow from approximately eleven percent to forty-two percent of the trust assets. The trust then held 16,000 shares of Limited stock.
In 1983, Huntington began a program to reduce the trust's holdings in Limited stock. Within two months of the second two-for-one split, Huntington had sold 1,000 shares of Limited stock. Huntington continued reducing the number of shares of Limited stock and by 1985, the number of shares in the trust was reduced from 16,000 to 9,700. In June 1985, the Limited stock split again, resulting in an increase from 9,700 shares to 19,400 shares in the trust. The Huntington sold 1,800 shares in 1986.
In June 1986, the Limited stock experienced a three-for-two split, and 8,950 shares were added to the trust. Huntington continued to gradually reduce the number of shares of Limited stock held by the trust and by 1990, the number of shares had been reduced from 26,350 to approximately 16,690.
In June 1990, the Limited stock split two-for-one, resulting in the trust having 33,380 shares. Within six months, Huntington had sold 5,000 shares of Limited stock. Huntington continued to sell Limited stock throughout its tenure as trustee. In 1997, Huntington transferred the trust to Merrill Lynch Trust Company as trustee, and the number of shares of Limited stock held by the trust at such time was 3,047.
During its administration of the trust, Huntington never purchased any shares of Limited stock. During these same years, Huntington distributed approxi-mately $1,730,000 to Mr. Pickerel and his daughters.
In his complaint, Mr. Pickerel contended, in part, that Huntington had breached its duty to diversify the trust's holdings. The complaint averred that Huntington had a policy that a trust could hold no more than ten percent of its assets in any one stock. The complaint further averred that by February 1992, the value of the Limited stock held by the trust was $761,722.50 and represented 66.6 percent of the market value of the trust's assets. The stock at that time was valued at $28.88 per share. The complaint averred that Huntington continued to reduce the number of shares held by the trust but that by 1995, the Limited stock still represented fifty-two percent of the trust's assets. At this time, the Limited stock was valued at only $17.12 per share. By September 1996, the value of the stock was $19.12 per share. Mr. Pickerel asserted that Huntington's failure to diversify the trust's assets by reducing its holdings in Limited stock to ten percent resulted in a significant decline in the value of the trust.
Huntington filed an answer and counterclaim. The counterclaim alleged Mr. Pickerel had agreed to sign a release of liability and indemnification in favor of Huntington at the time Huntington resigned as trustee. Mr. Pickerel was granted partial summary judgment on the counterclaim. However, before a final judgment entry as to all claims had been journalized, Huntington voluntarily dismissed its counterclaim without prejudice.
On August 23, 2000, Mr. Pickerel filed a motion for summary judgment on his claim that Huntington failed to properly diversify the trust's holdings pursuant to the ten percent rule. Huntington filed a memorandum contra and a cross-motion for summary judgment. Various other memoranda were filed in support of the parties' positions. On April 26, 2001, the trial court rendered a decision granting summary judgment in favor of Huntington. In essence, the trial court determined that there was no genuine issue of material fact on the issue of Huntington's alleged failure to properly diversify the trust's assets. In addition, the trial court determined that Mr. Pickerel had failed to raise a genuine issue with regard to his alleged damages.
A final judgment entry was journalized on May 21, 2001, granting judgment in favor of Huntington as to all claims. Mr. Pickerel (hereinafter "appellant") has appealed to this court, assigning the following errors for our consideration:
 1. The court below committed reversible error by granting summary judgment to the defendant.
 2. The court below committed reversible error by overruling plaintiff's Motion for Summary Judgment.
Appellant's assignments of error address the appropriateness of summary judgment in favor of Huntington (hereinafter "appellee") and, therefore, we address the assignments of error together. Summary judgment is appropriate when, construing the evidence most strongly in favor of the nonmoving party, (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, that conclusion being adverse to the nonmoving party. Zivich v. Mentor Soccer Club, Inc. (1998), 82 Ohio St.3d 367, 369-370, citing Horton v. Harwick Chem. Corp. (1995), 73 Ohio St.3d 679, paragraph three of the syllabus. Our review of the appropriateness of summary judgment is de novo. See Smiddy v. The Wedding Party, Inc. (1987), 30 Ohio St.3d 35.
In essence, appellant contends he raised genuine issues as to whether appellee negligently managed the trust by failing to diversify the trust's holdings, specifically, by failing to adhere to appellee's own internal guideline which calls for no more than ten percent of a trust's holding to be in one specific investment. One of the main issues argued below and in the appeal herein is the scope of appellee's duty and discretion with regard to diversification and whether such duty was breached. As to the issue of duty, we note that the powers and duties of a trustee are controlled by the terms of the trust instrument itself. Daloia v. Franciscan Health Sys. of Cent. Ohio, Inc. (1997), 79 Ohio St.3d 98 . Appellee points to various provisions of the 1972 trust agreement which purportedly granted it broad discretion in investing in and retaining any asset or property.
Appellant asserts appellee had a duty to diversify. In support of his position, appellant cites to Stevens v. Natl. City Bank (1989),45 Ohio St.3d 276. In Stevens, the Supreme Court stated that it was well-established that a trustee, except as otherwise provided by the terms of the trust, is under a duty to distribute the risk of loss within the trust by prudent diversification; by limiting the proportion of the total trust assets which are invested in any one stock or class of securities. Id. at 281. Such duty includes the disposal or sale of investments in the trust at the time of its creation which, although otherwise proper investments to retain, are improper because such are not properly diversified. Id. In addition to the duty outlined in Stevens, appellant points to appellee's internal policy which, in essence, provided that no more than ten percent of the total assets of a trust should be invested in the stock of a single entity.
Again, the issue of duty was strongly litigated below. However, we do not reach the issue of whether or not genuine issues exist as to duty because appellant failed to raise any genuine issue as to the damages element. If we assume, for the sake of argument only, that appellee breached a duty to prudently administer the trust by failing to properly diversify, appellant must still show that the trust was damaged as a result of such breach. Indeed, in Stevens, the Supreme Court stated that a breach of the duty to diversify may render the trustee liable for any loss sustained by such breach. Id. at 281.
Further, the Restatement of the Law 2d, Trusts (1959), 458, Section 205, states:
 If the trustee commits a breach of trust, he is chargeable with[:]
 (a) any loss or depreciation in value of the trust estate resulting from the breach of trust; or
* * *
 (c) any profit which would have accrued to the trust estate if there had been no breach of trust.
In his complaint, appellant asserted he was damaged by appellee's breach and failure to diversify and requested monetary damages based on the losses sustained by the trust as a result of such alleged failure. Appellee contends appellant failed to provide any evidence of such damages. Appellee points out that appellant based his alleged damages on calculations beginning in 1992, the time the Limited stock began to decline in value. Appellee asserts that under appellant's theory of damages, appellant would be permitted to reap the benefits of almost a decade of phenomenal growth in Limited stock, during which time the trust held well over ten percent of its assets in Limited stock, and then assert breach based on the failure to diversify once the stock began to decline in value.
Appellee asserts that appellant's theory of damages is a so-called "peak-of-the-market" claim, which is prohibited by the Supreme Court case In Re Estate of Bentley (1955), 163 Ohio St. 568 . In Re Estate of Bentley held:
 1. In the absence of fraud or bad faith, an executor of an estate may not be called to account for not selling stocks belonging to the estate at the peak of the market occurring while such stocks are in his possession.
 2. An executor of an estate, who is confronted with a declining market at the time he receives stocks belonging to the estate, and who, in good faith, does not sell such stocks until later when the market has further declined, may not be held accountable for either negligence or nonfeasance because of his mistake in judgment; any loss resulting from such conduct is damnum absque injuria. [Emphasis sic.]
Id. at paragraphs one and two of the syllabus. The Supreme Court further stated:
 Ordinarily, where a fiduciary is entrusted with securities and has the power of sale, in the absence of fraud or bad faith he can not be charged with any loss if he fails to make a sale at the peak of the market. The absurdity of any contrary rule is at once apparent. If the market was lower at the time the securities were sold, and the fiduciary was to be charged with the loss for not selling them at an earlier date, it would logically follow that, if he had sold them at the earlier date and the market had advanced, he would be held liable for not having held the securities and thus realized the gain.
Id. at 574. For the reasons that follow, we find that regardless of what theory of recovery he asserts, appellant simply has not raised a genuine issue of fact as to damages.
Attached to appellee's February 1, 2001 supplement to its motion for summary judgment was the affidavit of Steven A. Buser, Ph.D. Dr. Buser is a faculty member of the Ohio State University, the Chair of the Department of Finance and an Associate Dean for the Fisher College of Business. Dr. Buser stated that from November 1982 through July 1997, Limited stock outperformed stock in general by an exceptional margin and that an investment in such stock in 1982 would have been worth substantially more than a similar investment in the Standard and Poor's Index of 500 ("S P 500") widely held stocks during the time-period at issue. For example, by 1997 an investment in Limited stock made in 1982 would be worth more than twice the amount of a similar investment in the S P 500.
Further, Dr. Buser stated that he analyzed the effect of an alternative investment strategy in which appellee would have implemented a policy of automatically selling off any year-end holdings of Limited stock in excess of ten percent of total trust assets. Under this alternative strategy, the trust would have been denied much of the extraordinary performance of the Limited stock, and pretax funds available for distribution to the beneficiaries would have been reduced to roughly $362,000 compared to the pretax proceeds actually earned by Huntington of roughly $1.24 million (for a difference of roughly $879,000).
Appellant responded to appellee's supplement to its motion for summary judgment by asserting that the breach of the duty to diversify occurring between 1992 and 1997 was not somehow mitigated by appellant's similar breach which occurred prior to 1992. However, appellant submitted no evidence authorized under Civ.R. 56(C) and (E) showing he was damaged by any failure, at any time, to diversify. Indeed, the record shows that appellant had the opportunity to submit proper evidence of his alleged damages, and thus raise a genuine issue of fact, but failed to do so. For example, on September 21, 2000, appellee filed a motion to exclude appellant's expert testimony because no experts had been identified at that point. On this same date, appellee filed a motion to compel appellant to identify his damages and the calculations thereof.
In a memorandum contra, appellant stated that he would identify his damages and the calculations used by October 31, 2000. On October 31, 2000, an agreed entry was journalized, ordering appellant to provide appellee with an itemized calculation of the damages allegedly caused by appellee, the source of any data used, the manner in which damages were calculated and any other relevant information regarding damages by October 31, 2000.
On two dates thereafter, appellee filed motions to extend the dispositive motion deadline due to the inability to depose appellant's identified damages expert. These motions were granted. On January 19, 2001, appellee filed a third motion to extend the dispositive motion deadline on the ground appellant had recently advised appellee that he would no longer be presenting expert testimony on damages. Instead, appellee was presented with a memorandum outlining appellant's theory of damages. This material was never submitted to the trial court in the form of an affidavit as required by Civ.R. 56(E).
As indicated above, appellee filed a supplemental motion for summary judgment on February 1, 2001, disputing appellant's theory of damages and attaching the affidavit of Dr. Buser. Appellant filed a memorandum contra on February 20, 2001, stating that no expert was needed on damages, as such required only simple mathematical calculations. Appellant stated that appellee had submitted sufficient expert opinion on which appellant could rely. Appellant stated that the trust should have been diversified in early 1992 when appellee acknowledged a risk. However, appellant's mere statements in a memorandum are insufficient to raise genuine issues of fact as to damages. Appellant submitted no appropriate materials to support his position as to damages and no evidence refuting appellee's evidence that showed the trust actually benefited, as a whole, from the amount of holdings in Limited stock over the years (including the years after 1992). Appellant's answer to an interrogatory setting forth his calculation of damages since 1992 also does not refute the evidence that, as a whole, the trust was not damaged but, indeed, was actually worth more because of the extensive holdings in Limited stock.
The Restatement of the Law 2d, Trusts (1959), 475-476, Section 209, is instructive on the issue of whether a genuine issue exists as to damages. Such section states, in pertinent part:
 (1) If the trustee fails to sell trust property which it is his duty to sell, the beneficiary can charge him with the amount which he would have received if he had properly sold the property, with interest thereon.
* * *
Comment:
* * *
 b. Measure of liability. It the trustee fails to sell trust property which it is his duty to sell, the beneficiary can require him to make good any loss caused by his failure to sell.
* * *
 If the trustee fails to sell trust property which it is his duty to sell, and the property subsequently appreciates in value, so that no loss results, the trustee is subject to no pecuniary liability. [Emphasis sic.]
Here, the unrefutted evidence is that the trust, as a whole, benefited from the holdings in Limited stock. Appellant failed to raise any genuine issue that the trust, as a whole, suffered as a result of any failure to reduce the holdings in such stock.
Appellant failed to raise any genuine issue of fact as to the issue of damages. Therefore, summary judgment in favor of appellee was appropriate. Accordingly, appellant's assignments of error are overruled.
Having overruled appellant's assignments of error, the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
LAZARUS and PETRE, JJ., concur.
[1] Ms. Hanley was subsequently dismissed from the action.